**UNION BAG & PAPER CORPORATION v. MITCHELL et al.**

No. 12844.

United States Court of Appeals Fifth Circuit.

Nov. 26, 1949.

John J. Bouhan, Savannah, Ga., Alexander A. Lawrence, Savannah, Ga., George W. Williams, Savannah, Ga., for appellant.

L. A. Hargreaves, Pearson, Ga., O. W. Franklin, Sr., Valdosta, Ga., H. C. Eberhardt, Valdosta, Ga., for appellee.

Before HUTCHESON, HOLMES and SIBLEY, Circuit Judges.

SIBLEY, Circuit Judge.

A. S. Mitchell and his wife sued Union Bag and Paper Corporation in the federal district court expressly "in trover" to recover damages in the sum of $100,000 for the conversion of timber itemized as:

(1) 129,791 board feet from 1,332 long leaf and slash pine trees with two or more turpentine faces suitable for sawmill purposes;

(2) 614,714 board feet from 12,020 short leaf and black pine trees; suitable for sawmill purposes;

(3) 200,400 board feet from 6,680 short leaf and black pine trees too small for sawmill purposes but suitable for other lumbering purposes; aggregating 945,905 feet; alleging that it had been cut and manufactured by defendant into paper products of the value of $100,000.[1] The answer admitted cutting the 1,332 trees in the first item but averred they contained only 78,000 board feet, admitted cutting 15 short leaf and black pines, all of which were plaintiffs, but by mistake, and offered payment therefor; denied cutting any other trees belonging to plaintiffs, and if it cut any it was done in the good faith belief that they belonged to defendant; admitted the trees were converted into pulpwood, and if there should be any recovery it should be only of the stumpage value of the timber. Jury trial was demanded and had, and a verdict rendered for the plaintiffs in round figures for $30,000.

The complaint exhibits four instruments, admitted by the answer, which constitute the plaintiffs' and defendant's title to the timber, which prior thereto was in V. W. Cook. By the first, dated July 31, 1941, Cook in consideration of $30,000 sold and conveyed to Mitchell and his wife, their heirs and assigns, "All the following timber on all of the lands hereinafter described: All long leaf and slash pine which during the limits for cutting hereinafter described has two or more turpentine faces; and also all of the short leaf pine timber (and the cypress) and all the hardwood timber suitable for lumbering, excepting however such cypress eight inches or smaller in diameter at four and one-half feet above the ground as the grantor may require for use in building fences." About 9,000 acres in Atkinson County, Georgia, are described. Seven years from Jan. 1, 1942, are named as the time for cutting, but an additional period of eight years may be taken, grantee having the right to work any timber for turpentine till required for cutting. "Grantees are to have full and complete rights of ingress and

---

I. There were additional counts for fire damage $12,500 to other trees, but these counts are not involved in this appeal.

egress with mills, men and teams. * * * It is understood that the grantees shall have the right to cut and remove such timber not covered by the foregoing conveying clause as may be required for use in logging or lumbering on the property. * * * It is understood and agreed that the grantees are to have the right to cut pulpwood or other low grade, low price material from any trees which they may cut under the conveying clause set forth, but that they are not to have the right to cut trees merely for such purposes." In the event of dispute the matter is to be referred to arbitration as described.

The other admitted exhibits to the complaint are conveyances of a third interest in the land by Cook to his wife in 1942, and by him and by his wife to Union Bag and Paper Corporation, each conveyance reciting that it is "subject to a saw-timber lease on certain timber upon the larger portion of said lands made July 31, 1941, to A. S. and Minnie Mitchell", with a reference to its record. The plaintiffs therefore from June, 1945, to June, 1946, when the defendant was cutting timber, owned that conveyed to them by Cook, while defendant owned the land and all the trees not so conveyed.

■ A main dispute in the case is the construction of Cook's timber grant to the Mitchells. There is no dispute about the 1332 long leaf and slash pines whose stumps showed that the trees when cut by defendant had two or more turpentine faces. All trees thus exhausted of their turpentine during the time limited for cutting were plainly granted to the Mitchells. It is testified by both Cook and Mitchell that Cook was engaged in and interested in turpentining, and that only long leaf and slash pines would produce turpentine; but that Mitchell was a sawmill man and dealt in lumber, and erected a $150,000 sawmill plant in Atkinson County a few months after buying this timber. Both the turpentined trees and the short leaf and black pines, if large enough, would make sawed lumber, and the Mitchells wanted them. But as will be seen from the items sued for as above set out, the Mitchells claim not only the turpentined two-faced long leaf and slash pines and the short leaf and black pines of "sizes suitable for sawmill purposes", but also short leaf and black pines "of sizes too small for sawmill purposes but suitable for other lumbering purposes". As the judge put it in his charge to the jury: "One of the issues for your determination is the meaning and scope of the phrase 'suitable for lumbering'. The plaintiffs contend that the phrase includes timber and trees of the kinds set forth in the conveyance, not only suitable for sawmill purposes, that is to say as lumber in the manufactured sense, but in addition thereto includes any of such trees or timber which were suitable for such purposes as fence posts and mine-pit props. Well, gentlemen of the jury, it would be up to you to determine which is correct". No objection was made to this charge, but it was manifest error to commit the construction of this unambiguous written instrument to the jury. "The construction of a contract is a question of law for the court. Where any matter of fact is involved (as the proper reading of an obscurely written word), the jury should find the fact." Georgia Code, § 20-701. It was error to submit the construction to the jury. Goldsmith v. White, 68 Ga. 334; Nelson v. Spence, 129 Ga. 35, 36, 58 S.E. 697; Heatley v. Long, 135 Ga. 153, 68 S.E. 783; Ludden & Bates Southern Music House v. Dairy & Farm Supply Co., 17 Ga.App. 581, 87 S.E. 823; Empire Mills Co. v. Burrell Co., 18 Ga.App. 253, 89 S.E. 530. The error would be harmless if it appeared that the jury construed it correctly; but we cannot tell in this case how they construed it, or how many small trees not suitable to saw they included in their general verdict of $30,000, for the evidence related to all sizes. In such a case the verdict must be set aside. Blanchard v. Tucker, Willingham & Co., 34 Ga.App. 405, 129 S.E. 908.

■■ For guidance in another trial we express our views of the true construction, under Georgia law. The Georgia cases touching contracts for growing trees are very numerous, but consistent, and we will refer only to a few. It is well settled that a description of trees as to size or usefulness, without more, means as of the date of the contract, and does not include such as by growth may later come within the de-

scription. McRae v. Stillwell Millen & Co., 111 Ga. 65, 36 S.E. 604, 55 L.R.A. 513; Allison v. Wall, 121 Ga. 822, 49 S.E. 831; Roberts v. Gress, 134 Ga. 271, 67 S.E. 802; Vandiver v. Byrd-Matthews Lumber Co., 146 Ga. 113, 90 S.E. 960; Neal Lumber & Mfg. Co. v. O'Neal, 175 Ga. 883, 888, 166 S.E. 647, 649. The word "timber", though aided often by other expressions, and by such circumstances as that the purchaser is a sawmiller, or that sawmills are mentioned, means as a rule such trees as are suitable to be sawed into lumber. In Neal Lumber & Mfg. Co. v. O'Neal, supra, the words were, "All the trees and timber of every kind and description growing or being" upon the described land, but it was held that only saw timber was meant, and not trees that grew to such dimensions during the period of removal. So in Parham v. Robins, 197 Ga. 386, 29 S.E.2d 608, 612, "merchantable timber" meant only trees fit to be used in building, manufacturing, or similar construction, and did not include small trees suitable only for pulpwood. This conveyance contained a reference to sawmills on the premises "for the purpose of manufacturing the timber into lumber." In Vandiver v. Byrd-Matthews Lumber Co., 146 Ga. 113, 90 S.E. 960, the words of conveyance were, "All the timber of whatever kind or description now growing", and were held to embrace only such trees as were fit to be used in building, manufacturing or similar construction. Reference was made to the old case of Dickinson v. Jones, 36 Ga. 97, 104, where it was said: "Timber is used technically to denote green wood of the age of twenty years or more, such as oak, ash, elm, beech, maple, and with us would include hickory, cypress, pine, gum and other forest trees." Also cited was Broad River Lumber Co. v. Middleby, 4 Cir., 194 F. 817, 819, where the words were "merchantable standing timber", and the court declared, "As a general rule the word timber, unless modified or controlled by other expressions in the contract, means * * * such trees as are fit to be used in buildings or similar construction".

■ The plaintiffs below relied on the words in the conveying clause "suitable for lumbering" as enlarging the meaning of "timber". No Georgia cases are found construing these words. Webster's New International Dictionary defines "lumbering" as "The business of cutting or felling timber or logs from the forest for lumber". And "lumber" is defined as "Timber, especially that sawed or split into boards, planks, staves, etc.", and further explains "rough lumber" as undressed, and "surfaced lumber" as dressed by a planer. This record and all the Georgia decisions are filled with references to "lumber" as the manufactured product of sawing timber. The plaintiff Mitchell testified that he was in 1941, and is and has long been in the lumber business, meaning sawmilling. This contract gives him the right to put mills on this land. He testifies that he had sawed about 1,000,000 board feet of lumber from this land by 1945, when the cutting by defendant began. He exhibits defendant's title deeds, in each of which his own contract is referred to as a "saw-timber lease". We have no doubt but that is what it is. "Suitable for lumbering" here means suitable to be sawed into lumber.

■ Reliance is also put by plaintiffs on the language, quoted above, which gives them the right to cut "pulpwood or other low grade material from any trees cut under the conveying clause". This does not enlarge the conveying clause, but refers to using the tops and branches of trees cut for lumbering, to make from them pulpwood or cordwood or the like. The clause expressly says, "but they are not to cut trees merely for such purposes". The Georgia court in Pennington v. Avera, 124 Ga. 147, 52 S.E. 324, had held that when timber is sold for sawmill purposes the purchaser had no right to use the tops and branches for cordwood. The clause in this contract was apparently inserted in view of that decision.

■ Our conclusion is that the plain intention of this contract is that Cook, in the turpentine business, dealing with Mitchell, in the lumber business, should retain title to all long leaf and slash pine trees of every size till he had turpentined them, but when by two or more turpentine faces he had exhausted them for turpentine purposes, Mitchell should have such trees to

saw till the period of removal ended. The short leaf and black or "loblolly" pines were not desirable for turpentine, and Mitchell was to have all of these which at the time of the conveyance were suitable to be sawed into lumber. Cook, and afterwards his grantee, retained the land itself and all the slash and long leaf pines not turpentined, and all the short leaf and black pines too small for sawing at that date. There was no trespass or conversion in cutting any retained tree. Cutting for round fence posts and mine props would not be "lumbering" within the meaning of this contract, and was never attempted by plaintiffs under it. It is common knowledge that small short leaf and black pine trees decay too quickly for such uses. One witness testifies in this record that he could tell the stumps of such by kicking them over within three years after the trees were cut.

As to the trees wrongly cut the evidence, save as to the two-turpentine-face long leaf pines, is in hopeless conflict. Witnesses for plaintiff testify to counting and measuring stumps several years after the cutting which they considered short leaf and black pine, eight inches and upwards in diameter. In addition they estimated without accurate count, a large number of smaller stumps. It appears that before cutting, long leaf and slash pines are easily distinguishable from others by the color of the bark, the foliage, and length of the straw. When the count was made about 3,000 acres had been burned over and the straw destroyed and the stumps scorched. Witnesses for the defendant say that the kind of tree cannot be told under such circumstances, and that in fact the great majority of the stumps were of long leaf and slash pines and not turpentined, there being very few saw size short leaf and black pines cut.

Aycock, who counted the stumps for plaintiffs, moreover, testifies: "I measured from eight inches up.

"Q. Did you make a record of all timber that was cut there? A. Yes, sir.

"Q. No matter who cut it, whether it was cut by Union Bag or by somebody else? A. Yes, sir." Since Mitchell testifies that he had cut about 1,000,000 board feet from this land before 1945, and Aycock testifies he had never been on the Cook land till May, 1946, we wonder how, except as to two-turpentine-face trees not in dispute, he could tell who had cut all the large trees whose stumps he was counting. Also, he counted all stumps 8 inches and upwards, but the evidence is undisputed that the rate of growth in this climate of a young slash pine, short leaf, or black pine is one-half inch in diameter per year, so that a tree cut in 1946 had grown two and a half inches since 1941, and a stump of eight inches cut in 1946 would represent a tree of about five and a half inches at the date of the contract and not conveyed by it, for no one testifies that a tree of less than eight inches diameter is suitable to saw. There is a serious lack of certainty in the evidence of plaintiffs. This conflict of course presented a jury issue. We notice it merely to emphasize the difficulty in which the jury were placed by the failure to receive a clear and complete construction of the contract.

Another issue is as to the wilfulness of any wrongful cutting. In Georgia in a trover case the plaintiff may elect to recover the converted property, or to have damages. The trees of course after felling became personal property. Here the wood of the trees has been changed, by some process not described in the record, into paper and the paper into bags and boxes, after having been untraceably mingled with other wood to which the defendant had good title. Recovery is sought of a proportion of the value of the mill's products averaged from June 1, 1945, when cutting began, to August 27, 1947, the date of suit. The figures on value of products were furnished by defendant on interrogatories for discovery, as was the value of wood pulp alone. The much vexed question of punishment for wilful conversion of timber is settled by a statute in Georgia, Code, § 105-2013: "Where plaintiff recovers for timber cut and carried away, the measure of damage is: 1. Where the defendant is a wilful trespasser, the full value of the property at the time and place of demand or suit brought, without deduction for his labor or expense. 2. Where the defendant is an unintentional or innocent trespasser, or in-

nocent vendee from such trespasser, the value at the time of conversion, less the value he or his vendor added to the property. 3. Where the defendant is a purchaser without notice from a wilful trespasser, the value at the time of such purchase." This language is taken from Parker v. Waycross & Florida R. R. Co., 81 Ga. 387, at page 396, 8 S.E. 871, the Georgia court taking it from E. E. Bolles Wooden-Ware Co. v. United States, 106 U.S. 432, 1 S.Ct. 398, 27 L.Ed. 230. It has been twice enacted into the Georgia Code. In Tennessee, Ala. & Ga. Ry. Co. v. Zugar, 193 Ga. 386, 18 S.E.2d 758, 759, the court after quoting the statute says: "In [each] case a 'wilful trespasser' * * * [is] one who knows that he is wrong, while an 'innocent trespasser' is one who believes that he is right"; and it is recognized that a jury question is generally presented. The defendant here claims that the 1332 long leaf two-turpentine-face trees were cut by mistake by German war prisoners hired from the United States, and that the other trees were cut under a bona fide claim of right. A jury question was presented; but appellant urges that the "property", that is the trees, cannot as a matter of law be traced into the products of the mill. We do not find that the statute has ever been applied beyond the first manufacture of trees into cross-ties or lumber. We are not informed how the wood of the cut trees is converted into pulp and the pulp into paper. The confusion of logs which the defendant did not own with those it did own, being the defendant's wrongful act, ought not to prejudice the plaintiff, and where as here the proportion is ascertainable, a like proportion of the pulp seems proper. We at this time prefer to make no positive ruling about the tracing of the pulp into the ultimate product to obtain an average for a period of over ten years. We do not know what the round figure found by the jury represents, whether damages for wilful trespass or innocent trespass or both; whether small trees not conveyed to the plaintiffs, but included in the estimates, form a part or not. The verdict happens to equal the original cost to the plaintiffs of all the timber, though Mitchell says he had before 1945

cut 1,000,000 feet, which is more than is claimed in this complaint. It does not appear how much he has cut since or is entitled still to cut. He says the market value had gone up greatly, however, since 1941. Having so much doubt about the basis of the verdict and its correctness, we conclude that the error of the court in not construing the contract for the jury is such that we ought to notice it, and reverse the case for a new trial on the first count of the complaint.

Reversed and remanded.